## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JEROME FORREST,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Case No: 1:22-cv-03220-JMC |
| **BALTIMORE CITY, MARYLAND: BALTIMORE POLICE DEPARTMENT,** | * | |
| | * | |
| *Defendant.* | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### <u>MEMORANDUM OPINION</u>

On December 14, 2022, Plaintiff, Lt. Jerome Forrest, filed this employment discrimination case against Defendant, Baltimore Police Department ("BPD" or "Defendant").[1]  (ECF No. 1). Plaintiff has brought five Counts against Defendant: (I) Violation of Title VII – Race Discrimination, (II) Violation of Title VII – Hostile Work Environment, (III) Violation of Title VII – Retaliation, (IV) Section 1983 claim for Violation of Plaintiff's Civil Rights Under Section 1981 of the Civil Rights Act, and (V) Violation of Maryland Fair Employment Practices Act ("MFEPA").  *Id.* at pp. 10–21.[2]  Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint (ECF No. 10).  In addition to Defendant's Motion, the Court has considered Plaintiff's Opposition (ECF No. 11) and Defendant's Reply (ECF No. 14).  The Court concludes that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons explained below,

---

[1] The Complaint's caption identifies Defendant as "Baltimore City, Maryland: Baltimore Police Department."  (ECF No. 1 at p. 1).  Although this caption could imply that Plaintiff has sued both the Baltimore Police Department and the City of Baltimore, the Complaint refers to "Defendant" in the singular, and it is apparent that Plaintiff intends for BPD to be the sole Defendant in this case.

[2] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.

the Court shall grant Defendant's Motion in its entirety, except that some claims will be dismissed with prejudice while others shall be dismissed without prejudice.

## I.   BACKGROUND

"At the motion to dismiss stage, the Court takes the allegations of the complaint as true, . . . and [it] construes any disputed allegations in the light most favorable to the plaintiff . . . ."[3] *Krell v. Queen Anne's Cnty.*, No. JKB-18-637, 2018 WL 6523883, at *2 (D. Md. Dec. 12, 2018) (internal citations omitted).

Plaintiff is an African American male.  (ECF No. 1 at p. 4, ¶ 14).  Plaintiff has been employed by Defendant since February 28, 2001.  *Id.* at p. 5, ¶ 22.  Plaintiff is a member of Baltimore City Lodge No. 3, Fraternal Order of Police ("FOP").  *Id.* at p. 4, ¶ 17.  The FOP is a Maryland corporation that is designated as the exclusive representative of Baltimore Police Officers holding the rank of, amongst others, lieutenant.  *Id.*  Among other responsibilities, the FOP aids in labor management relations.  *Id.* at p. 4, ¶ 19.  The relationship between Defendant and the FOP is governed by a Collective Bargaining Agreement.  *Id.* at p. 4, ¶ 17.  A Memorandum of Understanding II covered Unit II employees, which includes police lieutenants.  *Id.* at p. 4, ¶ 18.

For nearly the entirety of his career with Defendant, Plaintiff has been employed as a Lieutenant in the Internal Affairs Section ("IAS").  *See id.* at p. 5, ¶ 22.  In early 2018, Major Stephanie Lansey—an African American Female—was appointed to the Office of Professional Responsibly ("OPR").[4]  *Id.* at p. 5, ¶ 23.  Also in early 2018, Chief David Cali—a White male—

---

[3] The Court attempts to provide the facts in a chronological manner to the best of its ability.  Plaintiff's Complaint at times lacks in clarity regarding the timing of allegations.

[4] Plaintiff's Complaint fails to describe the relationship between OPR and IAS, or any other division which is mentioned throughout the Complaint.

was appointed to OPR.  *Id.*  Since the appointment of Major Lansey and Chief Cali, Plaintiff has "faced a series of actions that have detrimentally affected his position as the Administrative Lieutenant at IAS." *Id.*  Due to this detrimental series of actions, Plaintiff interviewed and was selected for a position with Defendant's Special Operations Section ("SOS"). *Id.*  In light of his selection to SOS, Plaintiff submitted his Form 70 transfer on November 27, 2018. *Id.*

Plaintiff informed Major Lansey and Chief Cali of Plaintiff's selection to SOS, but they replied that Plaintiff would not be reassigned to SOS until a suitable replacement for Plaintiff arrived. *Id.* at p. 5, ¶ 24.  Major Lansey and Chief Cali signed Plaintiff's Form 70 without indicating that the transfer was pending the appointment of Plaintiff's suitable replacement, and the refusal to transfer Plaintiff was in direct contradiction to Defendant's policy and practice. *Id.* In the interim, although Plaintiff had previously been responsible for supervising ten individuals— half of whom were fellow officers and half of whom were civilian employees—Plaintiff's supervisory responsibility was reduced to two individuals. *Id.* at p. 5, ¶ 25.  Plaintiff was also removed from the United States Department of Justice ("DOJ") Consent Decree Discussion Team for IAS. *Id.*  Further, on or about November 20, 2018, Plaintiff discovered that his access level was dropped from Level 1 to Level 2, and this drop in access level prevented Plaintiff from performing several of his duties. *Id.* at p. 6, ¶ 26.  These duties were reassigned amongst other employees, including two White males, one Hispanic male, one African American male, one African American female, and one White female. *Id.*  Major Lansey, without the knowledge of Chief Cali, ordered Plaintiff's change of access. *Id.* at p. 6, ¶ 27.  When Plaintiff asked Major Lansey why she had ordered the change in access, Major Lansey replied that she "did not have to explain herself to [Plaintiff]." *Id.*

On or about December 5, 2018, IAS command sent an email over Defendant's Broadcast stating that members should discontinue the practice of contacting specific individuals in IAS—specifically Plaintiff—by email or telephone to obtain informational requests. *Id.* at pp. 6–7, ¶ 30. Rather, all such requests should be sent to an email to which Plaintiff did not have access. *Id.* at p. 6, ¶ 30. On or about December 20, 2018, Plaintiff's "admin access" to IApro and BlueTeam was restricted under the direction of Major Lansey. *Id.* at p. 7, ¶ 31. This restriction prevented Plaintiff from making changes and correcting errors on the "backend of the system," and the restriction prevented Plaintiff from assisting field supervisors when they encountered technical issues with BlueTeam. *Id.*

On or about January 11, 2019, Sgt. Lloyd[5] and Plaintiff met with Chief Cali and Major Lansey about Plaintiff's transfer to SOS. *Id.* at p. 7, ¶ 32. During this meeting, Major Lansey and Chief Cali informed Plaintiff that he would not be transferred until they found a replacement.[6] *Id.* Major Lansey and Chief Cali refused Plaintiff's transfer at that time despite the fact that several other lieutenants were already in IAS. *Id.* Notably, other officers in IAS had previously been reassigned without the need for a replacement beforehand. *Id.* Furthermore, Chief Cali did not have anyone in mind to replace Plaintiff, nor did Chief Cali have any specific plan to obtain a replacement. *Id.* Chief Cali asserted that he would be "crazy" if he released someone from IAS before obtaining another person as a replacement. *Id.*

On or about January 28, 2019, Plaintiff discovered that his access level was demoted from Level 2 to Level 3. *Id.* at p. 7, ¶ 33. Furthermore, Lt. Gene Ryan was transferred into IAS as Plaintiff' replacement. *Id.* at pp. 7–8, ¶ 33. Despite the arrival of Plaintiff's replacement, Plaintiff

---

[5] Plaintiff's Complaint provides no details regarding Sgt. Lloyd's first name or assignment.

[6] Reading the Complaint, it is unclear if this meeting encompassed the first instance in which Plaintiff was informed regarding the precondition of his transfer to SOS. Regardless, the Court's analysis remains the same.

was never notified of when to report to his new assignment in SOS. *Id.* at p. 8, ¶ 33. As of February 4, 2019, IAS had a total of nine lieutenants, but Plaintiff was still not permitted to leave for his new position with SOS. *Id.* at p. 8, ¶ 34.

At some point, Plaintiff involved the FOP, and the FOP notified Chief Cali and Major Lansey of the violation of the FOP contract. *Id.* Shortly thereafter, Major Lansey summoned Plaintiff into her office and informed Plaintiff that he was no longer permitted to continue his secondary employment with CI-Technologies. *Id.* at p. 8, ¶ 35. Plaintiff had enjoyed this secondary employment since 2015, and the loss of this secondary employment caused Plaintiff significant loss in income and job opportunity. *Id.*

After the FOP became involved, Plaintiff finally consummated his transfer to SOS. *See id.* at p. 8, ¶ 36. Plaintiff provides no indication as to specifically when this transfer occurred. Plaintiff worked in SOS for eleven months. *Id.* After Plaintiff was with SOS for eleven months, a lieutenant's position became available in IAS. *Id.* Although Major Lansey was still assigned to IAS, Plaintiff inquired about the position and was told that under the new Deputy Commissioner ("DC"), Brian Nadeau, things would be different. *Id.* With this assurance, Plaintiff submitted a transfer request to return to IAS. *Id.* Pursuant to his request, Plaintiff interviewed for the position and was selected to return due to his experience and vast knowledge of working in IAS. *Id.*[7]

Plaintiff's new supervisor at IAS was Capt. Donald Diehl. *Id.* at p. 8, ¶ 37. Prior to Plaintiff reporting back to IAS, DC Nadeau directed Capt. Diehl to speak with Plaintiff regarding how things would be different upon Plaintiff's return to IAS. *Id.* Capt. Diehl informed Plaintiff that DC Nadeau instructed Major Lansey to not have any direct contact with Plaintiff. *Id.* However,

---

[7] At the time of Plaintiff's return to IAS, IAS had been renamed as the Public Integrity Bureau ("PIB"). *Id.* at p. 8, n. 1. For purposes of clarity—and because the vast majority of Plaintiff's allegations relate to the period before IAS's renaming—the Court will refer to PIB as IAS throughout this Memorandum Opinion.

this instruction caused Plaintiff reputational harm and emotional distress.  *Id.* at p. 9, ¶ 37.
Furthermore, Plaintiff suffered a negative impact to his work because he had to work around this
gap in his chain of command.  *Id.*

In contrast to Plaintiff, other officers not within his protected category received more
favorable treatment and have been approved for transfers without replacements in place: (1) Lt.
Robert Morris (White male), who transferred from Ethics[8] to Criminal Intel, (2) Sgt. Michael Brinn
(White Male), (3) Sgt. Theresa Scott (African American female), (4) CSO Michelle Cunningham
(African American female), and (5) OSS IIII Debbie Crocket (African American Female).  *Id.* at
p. 9, ¶ 39(a)–(b).  Other than for Sgt. Brinn, the Complaint provides no details regarding from
which divisions the purported comparators were transferred, nor does the Complaint specify to
where those purported comparators were transferred.

Since his transfer back to IAS, Plaintiff "has since been the target of race and color
discrimination, retaliation, and workplace hostility."  *Id.* at p. 10, ¶ 40.  Plaintiff filed a formal
Charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission
("EEOC") on December 7, 2021, alleging race and color discrimination, retaliation, and hostile
work environment.  *Id.* at p. 3, ¶ 8; (ECF No. 10-4 at p. 2).  Plaintiff filed his formal Charge "in
addition to his internal complaint . . . ."  *Id.*  However, Plaintiff makes no mention of when he filed
an internal complaint with Defendant regarding Major Lansey's treatment of Plaintiff.  Plaintiff
alleges that that he was forced to inquire into the results of the investigation which followed from
his internal complaint.  *Id.* at p. 10, ¶ 41.  Only upon his inquiry was Plaintiff sent a letter regarding
the outcome of his internal complaint's investigation.  *Id.*  Plaintiff alleges that Defendant delayed

---

[8] At no point in the Complaint does Plaintiff clarify whether Ethics is its own division, part of IAS, part of OPR, or part of some other division.

informing Plaintiff of the outcome, and this delay prolonged the timeline for Plaintiff to file his formal EEOC Charge. *Id.*

Defendant's Motion includes exhibits in the form of Plaintiff's EEOC Charge and the EEOC's Dismissal of Charge. (ECF Nos. 10-4 & 10-5). On September 26, 2022, the EEOC dismissed Plaintiff's Charge *via* a Dismissal of Charge. (ECF No. 10-5 at p. 2). In the Dismissal of Charge, the EEOC stated:

> The EEOC is closing this charge because your charge was not filed within the time limits under the law; in other words, you waited too long after the date of the alleged discrimination to file your charge.

*Id.* Following the EEOC's issuance of the Dismissal of Charge, Plaintiff filed suit in this Court on December 14, 2022. (ECF No. 1).

## II.   STANDARD OF REVIEW

### A. Rule 12(b)(1) Subject Matter Jurisdiction—Eleventh Amendment Sovereign Immunity

Defendant asserts that it is protected by Eleventh Amendment sovereign immunity as to Plaintiff's MFEPA claim (Count V). (ECF No. 10-2 at pp. 25–27). When a defendant raises the defense of Eleventh Amendment sovereign immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell*, 2018 WL 6523883, at *3.[9] The existence of subject matter jurisdiction, both constitutionally pursuant to Article III and statutorily pursuant to the various enabling statutes found in Title 28, is a prerequisite to the exercise of power by a federal court. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). Unlike personal

---

[9] "The Fourth Circuit has not decided whether sovereign immunity is grounds for dismissal for failure to state a claim under Rule 12(b)(6) or for lack of subject matter jurisdiction under Rule 12(b)(1), but this Court favors analysis under Rule 12(b)(1) because immunity functions as a 'block on the exercise of that jurisdiction.'" *Id.* (quoting *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018)).

jurisdiction which can be waived, subject matter jurisdiction cannot be conferred by any action or inaction by the parties. *Id.* at 480.

State sovereign immunity originates in the Eleventh Amendment to the U.S. Constitution. "Under the doctrine of sovereign immunity, neither a contract nor a tort action may be maintained against the State unless specific legislative consent has been given and funds (or the means to raise them) are available to satisfy the judgment." *Effland v. Balt. Police Dep't*, No. 1:20-cv-3503-CCB, 2022 WL 3107144, *6 (D. Md. Aug. 4, 2022) (quoting *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 305 (2001)).[10] "This doctrine protects the state and its agencies from liability for both ordinary and state constitutional torts." *Effland*, 2022 WL 3107144 at *6 (citing *Cherkes*, 140 Md. App. at 306).

Although the language of the Eleventh Amendment suggests that it deprives a federal court of subject matter jurisdiction over such claims, and some courts have reached that conclusion using a traditional analysis, the Fourth Circuit has noted important differences between a traditional subject matter jurisdiction analysis under Article III to the Constitution as compared to the hybrid jurisdictional analysis required by the Eleventh Amendment. In *Constantine*, *supra*, for example, relying primarily on the fact that, unlike subject matter jurisdiction, Eleventh Amendment sovereign immunity can be waived by the parties and imposes no requirement on a court to raise it *sua sponte*, the Fourth Circuit concluded that Eleventh Amendment sovereign immunity does not deprive a court of subject matter jurisdiction in the traditional Article III sense. *Id.* at 482. At the same time, the Court noted that Eleventh Amendment sovereign immunity was not a mere

---

[10] On December 14, 2022, "the former Court of Appeals of Maryland [was] renamed the Supreme Court of Maryland and the Court of Special Appeals [was] renamed the Appellate Court of Maryland." MARYLAND COURTS, *Appellate Courts*, https://www.mdcourts.gov/opinions/opinions (last visited Mar. 9, 2023). "This is a change in name only and does not affect the precedential value of the opinions of the two courts issued before the effective date of the name change." *Id.*

affirmative defense given the reality that it is not simply a defense to a plaintiff's allegations, but a privilege designed "to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).  All this is to say that while the Eleventh Amendment cannot be considered a true limit on this Court's subject matter jurisdiction, it nonetheless blocks the exercise of that jurisdiction when present.  *Gross*, 308 F. Supp. 3d at 865.

Thus, notwithstanding the hybrid nature of Eleventh Amendment sovereign immunity, the decisions in this District have favored addressing Eleventh Amendment sovereign immunity under the rubric of a Rule 12(b)(1) analysis versus Rule 12(b)(6).  *Id.*; *see also Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 579 n.6 (D. Md. 2021).  The Court will do so here.  This course of action is also consistent with the Supreme Court of the United States' direction that because it establishes not just a defense but a privilege from suit, sovereign immunity should be addressed at an early stage of the case.  *See Alden v. Maine*, 527 U.S. 706, 713 (1999).

### B. Rule 12(b)(6) Failure to State a Claim

"Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *4 (D. Md. Mar. 15, 2016) (quoting Fed. R. Civ. P. 8(a)(2)).  "Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted."  *Love*, 2016 WL 1028001 at *4.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court of the United States' opinions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 544 (2007), "require that complaints in civil actions be alleged with greater specificity than previously required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 288 (4th Cir. 2012)). When ruling on a Rule 12(b)(6) motion to dismiss, a court must apply "[t]wo working principles . . . ." *Iqbal*, 556 U.S. at 678. First, although a court must accept as true all the factual allegations contained in a complaint, any legal conclusions that are drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[]" to plead a claim). Second, a complaint shall be dismissed if it does not allege a "plausible claim for relief . . . ." *Id.* at 679. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (other citation omitted). In determining whether a plaintiff has stated a plausible claim for relief, a court must "draw on its judicial experience and common sense." *Id.* at 679 (other citation omitted).

"[U]nder limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment." *Yampierre v. Balt. Police Dep't*, No. ELH-21-1209, 2022 WL 3577268, *17 (D. Md. Aug. 18, 2022) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). As indicated in the "I. Background" section above, Defendant submitted a copy of Plaintiff's formal EEOC Charge (ECF No. 10-4) and a copy of the EEOC's Dismissal of Charge (ECF No. 10-5). "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Yampierre*, 2022 WL 3577268 at *17 (citing *Campbell v. Mayorkas*, No. 3:20-cv-697-MOC-DSC, 2021 WL 2210895, *1, n. 3 (W.D.N.C. July 1, 2021)).

Thus, the Court may consider the Charge and the EEOC's Dismissal of Charge in resolving Defendant's Motion. *See Yampierre*, 2023 WL 3577268 at *17.

### III.   ANALYSIS

#### A.   Plaintiff's Claims Brought Under Title VII (Counts I, II, and III) Are Time-Barred.

##### 1.   Title VII Generally

"Title VII prohibits an employer, *inter alia*, from discriminating against 'any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020) (quoting 42 U.S.C. § 2000e–2). "Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding." *Angelini*, 464 F. Supp. 3d at 776 (citing 42 U.S.C. §2000e–3). "Thus, an employer violates Title VII by taking an adverse employment action against an employee because that employee exercised his rights under Title VII." *Angelini* 464 F. Supp. 3d at 777. Going further, Title VII "prohibits 'the creation or perpetuation of a discriminatory work environment.'" *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 426 (2013)). "An actionable hostile work environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Angelini*, 464 F. Supp. 3d at 777 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015)).

"In general, *at trial* a plaintiff may establish discrimination or retaliation under Title VII through two avenues of proof." *Angelini*, 464 F. Supp. 3d at 777 (other citations omitted). "The plaintiff's first avenue is to offer direct or indirect evidence of discrimination under ordinary principles of proof." *Id.* (quoting *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996),

*cert. denied*, 520 U.S. 1116 (1997)) (internal quotation marks omitted). "The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court [of the United States] in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Angelini*, 464 F. Supp. 3d at 778 (other citations omitted). However, as already stated, "these avenues of proof pertain to trial." *Id.* at 778. "[A]t the motion to dismiss stage[,] the question is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII above a speculative level." *Gaines v. Balt. Police Dep't*, No. ELH-21-1211, 2023 WL 2185779, *23 (D. Md. Feb. 22, 2023)[11] (citation and internal quotation marks omitted). "To that end, reference to the prima facie case informs a court's evaluation of a motion to dismiss." *Yampierre*, 2022 WL 3577268 at *16 (other citations omitted).

## 2.    Plaintiff's Title VII Claims (Counts I, II, & III) Must Be Dismissed Because They Are Time-Barred.

"Before filing suit under Title VII, . . . a plaintiff must exhaust administrative remedies." *Id.* (other citations omitted). "To do so, a plaintiff must file a 'charge' of discrimination with the EEOC or an appropriate state or local agency within 180 days of [when] 'the alleged unlawful employment practice occurred." *Id.* at 777 (quoting 42 U.S.C. § 2000e–5(e)(1)). "This period is extended to 300 days in a deferral state, such as Maryland." *Angelini*, 464 F. Supp. 3d at 777. "The Fourth Circuit has admonished that the exhaustion requirement is not 'simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit.'" *Id.* (quoting *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005)). "Rather, administrative exhaustion

---

[11] The Court issued its decision in *Gaines* on February 22, 2023. However, on April 7, 2023, the author of *Gaines*— the Honorable Ellen L. Hollander—wrote to the parties in *Gaines* to inform them that the opinion had been selected for publication in the Federal Supplement. (Dkt. No. 1:21-cv-01211-ELH at ECF No. 24). Judge Hollander's correspondence to the parties in *Gaines* indicated that she "made a handful of non-substantive, 'bluebook' corrections." *Id.* at p. 1. Accordingly, the opinion in *Gaines* was reissued on April 7, 2023. Dkt. No. 1:21-cv-01211-ELH at ECF No. 25. Although the *Gaines* opinion appears twice published on Westlaw, the Court cites only to the original February 22, 2023 edition.

advances the complementary goals 'of [(1)] protecting agency authority in the administrative process and [(2)] promoting efficiency in the resolution of claims.'"  *Angelini*, 464 F. Supp. 3d at 787 (quoting *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019)).

Depending on the type of Title VII claim, the limitations period is determined based on the date of discrete acts of alleged discrimination or retaliation or, under limited circumstances, when a connected series of acts occurs under the so-called "continuing violation doctrine."  Regarding discrete acts of alleged discrimination or retaliation, "[a]ny discrete acts of discrimination that occurred prior to the applicable [limitations] period are procedurally barred and cannot be used as a basis for recovery."  *Angelini*, 464 F. Supp. 3d at 787 (quoting *Gilliam v. S.C. Dep't of Juv. Just.*, 474 F.3d 134, 139 (4th Cir. 2007)).  "This includes discrete acts that are related to acts alleged in timely filed charges."  *Angelini*, 464 F. Supp. 3d at 787 (citing *Gilliam*, 474 F.3d at 139); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").  "In contrast, under the continuing violation doctrine, a Title VII plaintiff [basing a claim on a connected series of occurrences that together create a hostile work environment] may obtain recovery from discriminatory acts that otherwise would be time-barred so long as another act fell within the limitations period and the acts are part of an ongoing pattern of discrimination."  *Angelini*, 464 F. Supp. 3d at 787 (citing *Gilliam*, 474 F.3d at 140).  This is because, contrary to claims for discrimination or retaliation premised on discrete acts, "a single act of harassment [with respect to hostile work environment claims] may not be actionable on its own."  *Morgan*, 536 U.S. at 115. Instead, as to hostile work environment claims, the Supreme Court of the United States concluded:

> It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period. . . . *Provided that an act contributing to the claim occurs within the filing period*, the entire time

period of the hostile environment may be considered by a court for the purposes of determining liability.

*Morgan*, 536 U.S. at 117 (emphasis added).

An understanding of Plaintiff's Title VII claims is useful in assessing whether Plaintiff's Title VII claims are time-barred as discrete acts or whether the continuing violation doctrine applies to prevent a finding that Plaintiff's claims are time-barred. Looking first at Plaintiff's Title VII race discrimination claim (Count I), Plaintiff pleaded that "[b]ecause of his race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in Violation of Title VII." (ECF No. 1 at p. 11, ¶ 48). In his Opposition, Plaintiff clarifies that Count I is predicated on the discrete acts of (1) a deprivation of supervisory duties, (2) restrictions applied to Plaintiff's access to departmental information, (3) the undue delay of implementing Plaintiff's request to transfer, (4) instructions to other employees to not contact Plaintiff for specific information requests, and (5) the fact that Plaintiff experienced further reputational harm when it was made known that Plaintiff made an internal complaint against Major Lansey. (ECF No. 11-1 at p. 5). As such, it appears that Plaintiff's Count I is predicated on alleged discrete acts of discrimination separate and apart from any alleged theory of a hostile work environment.

By contrast, Count II of Plaintiff's Complaint alleges a different type of Title VII violation—hostile work environment. Thus, as long as at least one act contributing to an alleged hostile work environment occurred within the limitations period, the continuing violation doctrine could theoretically apply to permit the Court's consideration of contributing acts outside the limitations period.

Looking to Plaintiff's Title VII retaliation claim (Count III), the Court utilizes a hybrid approach because retaliation can be based either on discrete acts or on the creation of a hostile workplace as retaliation for engaging in protected activity. Here, Plaintiff claims to have suffered

retaliation as a result of Plaintiff's internal complaint and his formal EEOC Charge. (ECF No. 15 at p. 22). Specifically, Plaintiff alleges that he was subjected "to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII." (ECF No. 1 at p. 15, ¶ 77). Plaintiff's Opposition, however, adds: "[Plaintiff] has averred sufficient factual allegations upon which relief can be granted for a *retaliatory hostile work environment*."[12] (ECF No. 11-1 at p. 6) (emphasis added). As it remains unclear whether Plaintiff is pursuing his retaliation claim premised upon discrete adverse employment actions or on a theory of a hostile work environment, both a discrete acts and continuing violation doctrine limitations analysis are necessary.

Plaintiff filed his EEOC Charge on December 7, 2021. Three hundred (300) days prior to December 7, 2021 was February 10, 2021. As such, any alleged discrete acts of discrimination or retaliation occurring prior to February 10, 2021, are time-barred and cannot support a claim under Title VII. Looking to the Complaint, Plaintiff's allegations of the majority of access restrictions, supervisory diminution, and the instruction to not contact Plaintiff for certain information requests refer to actions taken in November 2018 and December 2018. The allegations of Plaintiff's refused transfer request and one additional reduction in access level occurred in January 2019 and February 2019. Unfortunately, Plaintiff's Complaint does not provide the dates on which Plaintiff transferred to SOS and subsequently returned to IAS. However, as the Complaint indicates that the FOP confronted Major Lansey and Chief Cali in early February 2019 regarding Plaintiff's transfer, it is reasonable to assume that Plaintiff's transfer to SOS occurred shortly thereafter. Because Plaintiff returned to IAS after eleven months with SOS, it is further reasonable to assume

---

[12] In *Yampierre*, the Court recognized that the claims within another complaint filed by Plaintiff's counsel was "not a model of clarity." *Yampierre*, 2022 WL 3577268 at *25. That same description applies to the Complaint in the case *sub judice*.

that Plaintiff returned to IAS sometime between December 2019–February 2020, approximately a year outside the February 10, 2021 statutory deadline. Plaintiff's last specific allegation is that he was caused reputational harm after returning to IAS and after it was discovered that he had complained about Major Lansey. However, in addition to offering no timeframe regarding this allegation, Plaintiff offers no support as to how such leaked information and resulting harm could qualify as an adverse action. As such, Plaintiff has not alleged a discrete act of discrimination or retaliation within the statutory limitations period, barring such claims.

Perhaps recognizing that he is time-barred as to "discrete acts" theories of recovery as alleged in Counts I and III, Plaintiff invokes the continuing violation doctrine, asserting that "the acts alleged in Plaintiff's complaint were a slowly escalating series of injuries . . . ." (ECF No. 11-1 at p. 3). Similarly, Plaintiff contends that "Plaintiff's allegations are related because the acts Plaintiff alleges are a part of a pattern of harassment and retaliation that resulted in a hostile work environment as a result of the discrimination that he alleged in his EEOC charge." *Id.* Therefore— according to Plaintiff—"Plaintiff's claims are not time-barred and are in fact subject to the continuing violation doctrine." *Id.* (citing *Morgan*, 535 U.S. at 114).[13] Furthermore, Plaintiff utilizes his Opposition to allege that:

> Defendant acted in bad faith in failing to not only diligently pursue an investigation into his allegations against Major Lansey, but also in intentionally waiting to provide an outcome of investigation to Plaintiff until the timeframe perceived by Defendant for Plaintiff to file a federal EEOC complaint might have elapsed, and that therefore this act itself also constitutes an adverse action and an unlawful act under Title VII.

(ECF No. 11-1 at p. 3).

---

[13] This citation is the only citation—to caselaw or otherwise—that Plaintiff provided in arguing against a finding that his Title VII claims are time-barred.

As stated above, the continuing violation doctrine only applies in the instances in which Plaintiff has pleaded a hostile work environment, i.e., Count II and partially in Count III. Accordingly, there is no doubt that Plaintiff's allegations of discrete adverse actions in the form of, *inter alia*, diminution in supervisory capacity are time-barred to the extent that Plaintiff intended to plead them separate from a theory of a hostile work environment. However, as discussed above, the continuing violation doctrine saves Plaintiff's hostile work environment-based claims only if a discriminatory adverse action is alleged to have occurred within the 300-day pre-filing period. Plaintiff's Complaint does not allege that any such action occurred within 300 days of Plaintiff's EEOC filing, barring those claims relying on the continuing violation doctrine. Although Plaintiff may not use his Opposition in an effort to amend his Complaint,[14] the Court further notes that a failure to investigate an internal complaint "does not amount to an adverse action under Title VII." *Yampierre*, 2022 WL 3577268 at *37.[15]

Because Plaintiff has failed to allege even a single discriminatory adverse action with any specificity within the 300-day pre-filing period prior to Plaintiff's filing of his December 7, 2021 EEOC Charge, Plaintiff's Title VII claims are time-barred in their entirety. To the extent that Plaintiff's Counts I or III are predicated on discrete acts and not on a theory of a hostile work environment, those Counts are dismissed with prejudice. *See Miller v. Bd. of Edu. for Montgomery Cty.*, No. TJS-19-3067, 2020 WL 7319332, *3 (D. Md. Dec. 11, 2020) (dismissing time-barred Title VII claims with prejudice). However, Count II (hostile work environment) and Count III

---

[14] "Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of [his] opposition briefing." *Yampierre*, 2022 WL 3577268 at *37 (other citations omitted).

[15] Defendant proactively addresses the concept of equitable tolling and the inapplicability of that doctrine in the case *sub judice*. (ECF No. 14 at pp. 4–5). "Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *Mezu v. Dolan*, 75 F. App'x 910, 912 (4th Cir. 2003). Plaintiff has not argued for the application of equitable tolling, nor has he alleged facts showing the applicability of that doctrine.

(retaliation)—to the extent Count III alleges *retaliatory hostile work environment*—are dismissed without prejudice.

Accordingly, the Court shall grant Defendant's Motion to the extent that the Court shall dismiss Plaintiff's Title VII claims without prejudice if premised on a theory of hostile work environment, and the Court shall dismiss Plaintiff's Title VII claims with prejudice to the extent that they are premised on discrete adverse actions.

## B.  Plaintiff Has Not Sufficiently Pleaded His § 1983 *Monell* Claim (Count IV).

Plaintiff alleges that Defendant and Defendant's named "Responsible Management Officials" retaliated against Plaintiff in violation of 42 U.S.C. §§ 1981–83.  (ECF No. 1 at p. 17, ¶ 93).  Specifically, Plaintiff alleges that Defendants' retaliatory conduct violated Plaintiff's freedom of speech and freedom of expression.  *Id.*  According to Plaintiff, the acts of retaliation described throughout his Complaint "are part of an institutional practice to cover up officer misconduct, discrimination, and retaliation against fellow Officers who stand up against the Department for violations of their civil rights that should protect them from discrimination and retaliation in the workplace."  *Id.* at p. 18, ¶ 99.  In sum, Plaintiff alleges that "Defendant failed to adopt clear policies and failed to properly train its management officials in handling, managing, and protecting employees who engage in statutorily-protected activities within the Police Department."  *Id.* at p. 18, ¶ 101.  For the reasons immediately following, Plaintiff has failed to sufficiently plead his § 1983 *Monell* claim.[16]

42 U.S.C. § 1981(a) provides: "all persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as

---

[16] Defendant does not argue for the applicability of sovereign immunity as to Plaintiff's *Monell* claim.  The absence of such an argument comports with "the weight of authority in this District hold[ing] that, although the BPD is a state entity for purposes of Maryland law, it is a municipal entity for purposes of § 1983."  *Yampierre*, 2022 WL 3577268 at *40) (other citations omitted).

is enjoyed by white citizens[.]"  In accordance with 42 U.S.C. § 1983, a plaintiff may file suit "against any person who, acting under color of state law, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United Sates." *Gaines*, 2023 WL 2185779 at \*23 (other citations omitted).  "However, § 1983 is not itself a source of substantive rights, but provides a method for vindicating federal rights elsewhere conferred." *Id.* (other citations and internal quotation marks omitted).  "In other words, § 1983 allows a party who has been deprived of a federal right under the color of state law to seek relief."  *Id.* (quoting *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999)) (internal quotation marks omitted).

To State a claim under § 1983, a plaintiff must allege: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'"  *Gaines*, 2023 WL 2185779 at \*23 (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Id.* at \*24 (quoting *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017)).  Here, the right arises under § 1981.  "A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements[]" as a retaliation claim brought under Title VII.  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d at 281 (other citations omitted).  As such, Plaintiff ultimately must establish "(1) that [he] engaged in a protected activity, . . . (2) that [his] employer took an adverse employment against [him], . . . and (3) that there was a causal link between the two events."  *Id.* (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)).  As indicated above, Plaintiff has alleged two protected acts for which Defendant allegedly

retaliated: (1) Plaintiff's internal complaint with Defendant, and (2) Plaintiff's formal EEOC Charge. (ECF No. 1 at p. 15, ¶ 75).

Plaintiff provides no indication as to when he filed his internal complaint. Therefore, the Court cannot consider a causal connection between a protected activity performed on an unknown date and the various instances of adverse actions which Plaintiff has alleged.[17] Furthermore, Plaintiff's Complaint is devoid of any specific allegations regarding adverse actions occurring after Plaintiff filed his formal EEOC Charge. Accordingly, Plaintiff has not stated a claim for retaliation under § 1981. In addition to these inadequacies, the Court will continue to address the further shortcomings of Plaintiff's *Monell* claim.

"There is no respondeat superior liability under § 1983." *Gaines*, 2023 WL 2185779 at *24 (citing *Ashcroft*, 556 U.S. at 676). "Thus, § 1983 requires a showing of personal fault based upon a defendant's own conduct." *Gaines*, 2023 WL 2185779 at *24 (citing *Vinnedge v. Gibbs*, 550 F.2d 926 928 (4th Cir. 1977)). "[T]he express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides for the exclusive federal remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."[18] *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701,735 (1989).[19]

"[L]ocal governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an 'official

---

[17] As previously stated, Plaintiff is incorrect in asserting that a failure by Defendant to investigate an internal complaint constitutes an adverse action. *Supra*, p. 14.

[18] "'State actor' in this context refers more broadly to state action, whether by 'state or municipal entities.'" *Gaines*, 2023 WL 2185779 at *24, n. 11 (citing *Stout v. Reuschling*, TDC-14-1555, 2015 WL 1461366, at *6 (D. Md. Mar. 27, 2015)).

[19] "Notably, § 1983 suits by individuals against a state for money damages are barred by the state sovereign immunity embodied in the Eleventh Amendment." *Gaines*, 2023 WL 2185779 at *25 (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979)). However, "the weight of authority in this District holds that the BPD is a municipal entity for purposes of § 1983." *Gaines*, 2023 WL 2185779 at *25.

municipal policy' that resulted in a violation of the plaintiff's rights." *Gaines*, 2023 WL 2185779 at *25 (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (2018)). As such, "a viable *Monell* claims consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Gaines*, 2023 WL 2185779 at *26 (other citations omitted). "When execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible." *Id.* (other citations omitted). "It is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1951 (2018) (quoting *Monell*, 436 U.S. at 691)).

A plaintiff may show the existence of an official policy in three ways: "(1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that manifest deliberate indifference to the rights of citizens." *Gaines*, 2023 WL 2185779 at *26 (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)) (internal quotation marks omitted). "Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute 'a custom or usage' with the force of law." *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691)). Furthermore,

> such a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, . . . or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state.

*Milligan v. City of Newport News*, 743 F.2d 227, 229–30 (4th Cir. 1984) (other citations omitted). "In corollary to these principles, it follows that a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Id.* at 230 (other citations omitted).

The Fourth Circuit has reiterated that to establish a *Monell* claim premised upon an alleged custom, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). "Both knowledge and indifference can be inferred from the extent of employees' misconduct." *Id.* (citation and internal quotation marks omitted).

Here, Plaintiff has not come close to sufficiently asserting an official policy or custom of Defendant that might give rise to liability. *See Gaines*, 2023 WL 2185779 at *28. The "Introduction" to Plaintiff's Complaint references Defendant's "widespread constitutional violations, the targeting of African Americans, and a culture of retaliation."[20] (ECF No. 1 at p. 1–

---

[20] The "Introduction" section of the Complaint provides that:

> On August 10, 2016, the Department of Justice published a scathing report about the Baltimore Police Department's widespread constitutional violations, the targeting of African Americans, and a culture of retaliation. And, while the investigation and report focused largely on how Baltimore police abused the law, the people they were meant to serve, and the public trust, the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug. **_This case is about when police are fearful of the police—their own brothers and sisters in blue._**

(ECF No. 1 at pp. 1–2, ¶ 1) (emphasis in original). This is the verbatim language Plaintiff's counsel utilized in the amended complaint considered and found insufficient by the Court in *Gaines*. Furthermore, the language is almost identical to that found insufficient by the Court in *Garcia v. Balt. Police Dep't*, No. BPG-22-1423, 2023 WL 3043953, *7 (D. Md. Apr. 21, 2023). Notably, although Plaintiff in the case *sub judice* is male, the Complaint's boilerplate language emphasizes the demise of the "Black women" Defendant employs. The issuance of this Memorandum Opinion will mark at least the third time in approximately five months that the Court has found the language utilized in Plaintiff's Complaint—or language remarkably similar—insufficient to plead a *Monell* claim.

2, ¶ 3).  Aside from these vague references provided at the beginning of Plaintiff's Complaint, Plaintiff's Complaint makes no allegations regarding how the discrimination and retaliation he asserts connect to the broader institutional issues of Defendant.  *See Gaines*, 2023 WL 2185779 at *28.  Furthermore, "there are no facts or allegations to establish a widespread and persistent pattern, practice or custom that would have provided actual notice of such conduct to [Defendant] such that the failure to address would constitute deliberate indifference."  *Id.* (other citations and internal quotation marks omitted); *see also Grant v. Balt. City Police Dep't*, No. RDB-21-2173, 2022 WL 16746703, at *8, n. 1 (D. Md. Nov. 7, 2022) (noting that under a traditional *Monell* analysis, the plaintiff's claim would fail because "[t]hough [p]laintiff herself may have been subject to retaliation within the BPD, there is no indication that such behavior has become a 'custom' among the Department.").

Turning to Plaintiff's failure to train claim, the Court recognizes such a claim to be a "species of a *Monell* claim."  *Gaines*, 2023 WL 2185779 at *28.  "The manner in which a municipality trains its employees is necessarily a matter of policy."  *Id.* (citation and internal quotation marks omitted).  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *City of Canton, Oh. v. Harris*, 489 U.S. 378, 389 (1989).  To establish a *Monell* claim based on inadequate training, a plaintiff must demonstrate: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training."  *Lewis v. Simms*, No. AW-11-cv-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, No. WDQ-09-2340, 2010 WL 93268, *4 (D. Md. Jan. 6, 2010)).

"Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty.'" *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell*, 824 F.2d at 1390). Important to the case *sub judice*, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390–91 (other citation omitted). Rather, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

Here, Plaintiff's Complaint is practically devoid of allegations pertaining to the alleged inadequacy of the training at issue, i.e., Plaintiff's Complaint is woefully deficient regarding the nature of the training, whether the training was a deliberate or conscious choice by Defendant, or whether the alleged adverse conduct resulted from said training. *See Lewis*, 2012 WL 254024 at *3. Indeed, the most Plaintiff alleges is that "Defendant failed to adopt clear policies and failed to properly train its management officials in handling, managing, and protecting employees who engage in statutorily-protected activities within the police Department." (ECF No. 1 at p. 18, ¶ 18). In *Jacques v. Balt. Police Dep't*, this Court held that "[s]uch a conclusory allegation, without more, is insufficient to state a plausible *Monell* claim on a failure-to-train theory." *Jacques v. Balt. Police Dep't*, No. 21-2682, 2023 WL 3198122, at *11 (D. Md. May 2, 2023) (considering identical language as found in Plaintiff's Complaint). Furthermore, Plaintiff "fails to recount a single allegation of [Defendant's] discrimination against others; the claim is about conduct towards

[P]laintiff." *Gaines*, 2023 WL 2185779 at *30.  Just as the Court concluded in *Gaines*, so too here are "[t]he few sporadic incidents alleged in the . . . Complaint . . . [inconsistent] with a policy, custom, or practice sufficient for *Monell* liability to attach." *Id.* (citing *Owens*, 767 F.3d at 403 ("sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will.") (other citation omitted); *Corbitt v. BPD*, RDB-20-3431, 2021 WL 3510579, at *7 (D. Md. Aug. 10, 2021) ("[A] single incident alone will not establish a policy or custom and requisite causal connection to [§] 1983 deprivation of rights.")).

For these reasons, Plaintiff has failed to sufficiently plead his *Monell* claim (Count IV). Therefore, the Court will dismiss that Count without prejudice.

### C. Defendant's Eleventh Amendment Sovereign Immunity Shields It from Liability Under the MFEPA (Count V).

Plaintiff has failed to sufficiently plead a claim under MFEPA because Defendant enjoys Eleventh Amendment sovereign immunity as to that claim.[21]  On November 7, 2022, the Honorable Richard D. Bennett considered whether sovereign immunity protected the BPD from a hostile work environment and retaliation claim brought under the MFEPA. *Grant v. Balt. Police Dep't*, No. RDB-21-2173, 2022 WL 16746703 (D. Md. Nov. 7, 2022).  Judge Bennett recognized that a "state may waive its sovereign immunity and consent to suit in federal court." *Id.* at *8. However, "the United States Court of Appeals for the Fourth Circuit has determined that the consent to suit provision in the MFEPA 'does not specify the State's intention to subject itself to suit in *federal court*, [and] . . . cannot be read to waive the State's Eleventh Amendment

---

[21] As previously stated, the Court considers the application of Eleventh Amendment sovereign immunity through the rubric of a Rule 12(b)(1) analysis.  "A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdiction allegations of the complaint [are] not true.'" *Grant*, 2022 WL 16746703 at *5 (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).  Here, Defendant pursues a facial challenge.

immunity.'" *Id.* at *9 (quoting *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 102 (4th Cir. 2019) (other citation and internal quotation marks omitted) (emphasis in original). "Therefore, the Baltimore City Police Department [(Defendant)] has properly asserted sovereign immunity as a defense to claims brought under the MFEPA in federal court." *Grant*, 2022 WL 16746703 at *9.

In *Effland*, the Honorable Catherine C. Blake of this Court also concluded that the BPD enjoys sovereign immunity protection from MFEPA claims.  "Under Maryland law, BPD is not an agency of the municipality of Baltimore; rather it is an agency of the state."[22] *Effland*, 2022 WL 3107144 at *6 (citing PUB. LOCAL LAWS OF MD., Art. 4 § 16-2 (a) (2021) ("The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland.")); *see also Bumgardner v. Taylor*, No. RDB-18-1438, 2019 WL 1411059, *6 (D. Md. Mar. 28, 2019) ("[T]o the extent that Plaintiff seeks to sue the BPD by asserting state law claims against individual officers in their official capacity, those claims are barred by the doctrine of sovereign immunity."); *Fish v. Mayor of Balt.*, No. CCB-171438, 2018 WL 348111, *3 (D. Md. Jan. 10, 2018) ("The state law claims against BPD will, therefore, be dismissed . . . on sovereign immunity grounds.").

In a footnote within *Yampierre*—a case decided between the issuance of the decisions in *Grant* and *Effland*—the Court noted, "[L]ooking purely at state law for the purpose of a state law claim, S.G. § 20-902 would seem to have waived the BPD's sovereign immunity." *Yampierre*, 2022 WL 3577268 at *47, n. 24.  For two reasons, this footnote does not alter the Court's analysis in the case *sub judice*, which comports with the great weight of decisions it has issued regarding

---

[22] Defendant asks the Court to take judicial notice "of the fact that local control of BPD has not yet been effected." (ECF No. 10-2 at pp. 25–26, n. 7).  Defendant cites to a *Baltimore Sun* article which is inaccessible absent a paid subscription. However, the Court need not take judicial notice of this fact because Plaintiff has not argued that Defendant has come under local municipal control.

BPD's ability to assert sovereign immunity.  First, the Court did not decide the issue of sovereign immunity in *Yampierre*: "Because plaintiff's [M]FEPA claim is subject to dismissal for failure to plead compliance with the LGTCA, it is unnecessary to consider the implication of this complicated question."  *Yampierre*, 2022 WL 3577268 at *47.  Turning to the second reason, the Court recognizes that MD. CODE ANN. S.G. § 20-903 (West 2023) provides, "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title."  However, MD. CODE ANN. S.G. § 20-1013(b) provides, "A civil action under this section shall be filed *in the circuit court for the county* where the alleged unlawful employment practice occurred."  (emphasis added).  As such, it appears clear to the Court that the doctrine of sovereign immunity shields Defendant from Plaintiff's MFEPA claim, and Defendant has not waived its ability to assert that defense.

Accordingly, Defendant's Motion is granted without prejudice as to Plaintiff's MFEPA claim (Count V).[23]  The Court further observes that Count V may also be time barred[24] and fail to state a claim, but the Court does not reach those issues given its conclusion as to the applicability of Eleventh Amendment sovereign immunity.

---

[23] "Dismissal of claims based on lack of subject matter jurisdiction must be without prejudice in accordance with precedent from the United States Court of Appeals for the Fourth Circuit."  *Grant*, 2022 WL 16746703 at *9, n. 3 (other citation omitted).

[24] "The statute of limitations for bringing suit under [M]FEPA is two years from the 'occurrence of the most recent alleged unlawful employment practice.'"  *Gaines*, 2023 WL 2185779 at *31 (quoting *Dale v. Md. Dep't Transp.*, No. ELH-13-191, 2015 WL 221628, at *21 (D. Md. Jan. 15, 2015), *aff'd*, 672 F. App'x 323 (4th Cir. 2017) (per curiam)). Therefore, Plaintiff would need to sufficiently plead an adverse employment action occurring on or after January 7, 2020.

IV.    CONCLUSION

Based on the reasoning set forth above, the Court shall:

1.  Grant Defendant's Motion as to Plaintiff's Title VII claims (Counts I, II, & III) without prejudice to the extent that Plaintiff's claims are predicated on a theory of a hostile work environment.  However, to the extent that Counts I and III are predicated on discrete adverse actions separate and apart from a theory of a hostile work environment, those claims are time-barred and dismissed with prejudice;

2.  Grant Defendant's Motion as to Plaintiff's *Monell* claim (Count IV) without prejudice; and

3.  Grant Defendant's Motion as to Plaintiff's MFEPA claim (Count V) without prejudice.

A separate order follows.


Date: June 6, 2023                                    /s/
                                              J. Mark Coulson
                                              United States Magistrate Judge