## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JEROME FORREST,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Case No: 1:22-cv-03220-JMC |
| **BALTIMORE CITY, MARYLAND:** **BALTIMORE POLICE** **DEPARTMENT,** | * | |
| | * | |
| *Defendant.* | | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### MEMORANDUM OPINION

On December 14, 2022, Plaintiff, Lt. Jerome Forrest, filed this employment discrimination case against Defendant, Baltimore Police Department ("BPD" or "Defendant").[1]  (ECF No. 1). Plaintiff has brought five Counts against Defendant: (I) Violation of Title VII – Race Discrimination, (II) Violation of Title VII – Hostile Work Environment, (III) Violation of Title VII – Retaliation, (IV) Section 1983 claim for Violation of Plaintiff's Civil Rights Under Section 1981 of the Civil Rights Act ("§ 1983"), and (V) Violation of Maryland Fair Employment Practices Act ("MFEPA").  *Id.* at pp. 10–21.[2] BPD moved to dismiss the original complaint on March 10, 2023.  (ECF No. 10).  The Court granted BPD's Motion to Dismiss in its entirety, finding that (1) Plaintiff's Title VII claims (Counts I-III) were time-barred because Plaintiff failed to allege a discriminatory adverse action with any specificity within the 300-day pre-filing period prior to Plaintiff's filing of his EEOC Charge; (2) Plaintiff's § 1983 claim (Count IV) was insufficiently

---

[1] The Complaint's caption identifies Defendant as "Baltimore City, Maryland: Baltimore Police Department."  (ECF No. 1 at p. 1).  Although this caption could imply that Plaintiff has sued both the Baltimore Police Department and the City of Baltimore, the Complaint refers to "Defendant" in the singular, and it is apparent that Plaintiff intends for BPD to be the sole Defendant in this case.

[2] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.

pled; and (3) BPD is shielded from liability under the MFEPA (Count V) by virtue of sovereign immunity.  *See generally Forrest v. Balt. City, Md.: Balt. Police Dep't*, No. 22-CV-03220-JMC, 2023 WL 3847429 (D. Md. June 6, 2023).

The Court granted Plaintiff leave to amend his Title VII claims to the extent they were predicated on a theory of hostile work environment, and the Court's dismissal of Counts IV and V was also without prejudice.  *Id.*  Plaintiff then filed an Amended Complaint on July 3, 2023.  (ECF No. 17).  Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Amended Complaint (the "Motion").  (ECF No. 20).  The Court has additionally considered Plaintiff's Opposition (ECF No. 21) and Defendant's Reply (ECF No. 22).  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, Defendant's Motion is **GRANTED**.

## I.    BACKGROUND

"At the motion to dismiss stage, the Court takes the allegations of the complaint as true . . . and [it] construes any disputed allegations in the light most favorable to the plaintiff . . . ." *Krell v. Queen Anne's Cnty.*, No. JKB-18-637, 2018 WL 6523883, at *2 (D. Md. Dec. 12, 2018) (citations omitted).

The Court previously detailed the underlying facts of this case in its June 6, 2023, Memorandum Opinion.  To summarize,[3] Plaintiff, an African American male, has been employed by the BPD since February 28, 2001.  (ECF No. 17 at pp. 4–5).  Plaintiff is a member of Baltimore City Lodge No. 3, Fraternal Order of Police ("FOP").[4]  *Id.*  The FOP aids in labor management relations for those employed by Defendant pursuant to a Collective Bargaining Agreement

---

[3] The following facts are nearly identical to the Court's previous recitation because, as noted in more detail below, Plaintiff's Amended Complaint is nearly identical to his initial Complaint with little revisions.  *Compare generally* (ECF No. 1), *with* (ECF No. 17).

[4] The FOP is a "Maryland corporation that is designated as the exclusive representative of Baltimore Police Officers holding the ranks of police officer, police agent, flight officer, police sergeant, police lieutenant, and detective." (ECF No. 17 at pp. 4–5).

between Defendant and the FOP. *Id.* at p. 5. A Memorandum of Understanding II covers Unit II employees, which includes police lieutenants. *Id.*

Plaintiff has spent the bulk of his career with Defendant as a Lieutenant in the Internal Affairs Section ("IAS"). *Id.* In early 2018, Major Stephanie Lansey (African American female) and Chief David Cali (White male) were appointed to the Office of Professional Responsibility ("OPR"). Plaintiff alleges that he has "faced a series of actions that have detrimentally affected his position as the Administrative Lieutenant at IAS" since then. *Id.* As such, Plaintiff interviewed and was ultimately selected for a position with Defendant's Special Operations Section ("SOS"), resulting in Plaintiff "submitting his Form 70 transfer on November 27, 2018." *Id.*

Upon informing Major Lansey and Chief Cali of Plaintiff's selection to the SOS, Plaintiff was informed that he could not be reassigned until a "suitable" replacement for him was selected, which Plaintiff asserts is in direct contradiction with Defendant's policy and practice. *Id.* at pp. 5–6. Plaintiff's employment as Administrative Lieutenant at IAS then changed in various ways. First, Plaintiff's supervisory capacity was reduced from ten individuals—five of whom were officers and five of whom were civilians—to two individuals: one officer and one civilian. *Id.* at p. 6. Plaintiff next discovered that he was removed from the United States Department of Justice ("DOJ") Consent Decree Discussion Team for IAS. *Id.* Then on or about November 20, 2018, Plaintiff learned that his access level was dropped from level 1 to level 2, thus impacting his ability to perform some of his duties as Administrate Lieutenant pending his transfer to the SOS. *Id.* These duties were ultimately reassigned amongst other employees, including two White males, one Hispanic male, one African American male, one African American female, and one White female. *Id.* Plaintiff's change of access "was ordered by Major Lansey seemingly without Chief

Cali's knowledge." *Id.* Major Lansey also told Plaintiff that "she did not have to explain herself to him" when Plaintiff requested to know why his access was changed. *Id.*

On or about December 5, 2018, IAS command sent an email over Defendant's broadcast system stating that members should discontinue contacting Plaintiff by email or telephone to obtain informational requests that Plaintiff was previously tasked with providing. *Id.* at p. 7. Instead, all such requests were to be sent to an email which Plaintiff did not have access. *Id.* Next, on or about December 20, 2018, Plaintiff's access to two software programs—IApro and BlueTeam— was restricted under the direction of Major Lansey thereby preventing Plaintiff from performing various administrative and technical duties. *Id.* Then on or about January 11, 2019, Sgt. Lloyd[5] and Plaintiff met with Chief Cali and Major Lansey about Plaintiff's transfer to the SOS, which is when the latter informed Plaintiff that they were unable to effectuate Plaintiff's transfer until they found a replacement for IAS lieutenant. *Id.* Despite there being several other lieutenants in IAS at that time and over Plaintiff's request that Sgt. Lloyd assume Plaintiff's duties while Defendant filled Plaintiff's vacant position, Chief Cali reiterated that he would not let Plaintiff leave IAS until a replacement was found and declined to select Sgt. Lloyd as the interim Administrate Lieutenant for IAS. *Id.* at pp. 7–8. Chief Cali asserted that he would be "crazy" if he released someone from IAS before obtaining another person as a replacement. *Id.* at p. 8.

In contrast to Plaintiff, other officers received more favorable treatment and have been approved for transfers without replacements in place: (1) Lt. Robert Morris (White male), who transferred from Ethics to Criminal Intel, (2) Sgt. Michael Brinn (White Male), (3) Sgt. Theresa Scott (African American female), (4) CSO Michelle Cunningham (African American female), and (5) OSS IIII Debbie Crocket (African American Female). *Id.* at p. 11. Other than for Lt. Morris,

---

[5] Just as his initial Complaint, Plaintiff's Amended Complaint provides no details regarding Sgt. Lloyd's first name, assignment, or any other information about Sgt. Lloyd.

neither the Complaint or Amended Complaint provide any details regarding from which divisions the purported comparators were transferred, nor do they specify to where those purported comparators were transferred.  Plaintiff further learned on or about January 28, 2019, that his access level was downgraded from level 2 to level 3.  *Id.*  That same day, Lt. Gene Ryan (White male) was transferred to IAS as Plaintiff's replacement, followed by Lt. Douglas Shroyer (White male) transferring to IAS on February 4, 2019, both of which occurred "without an HR order."  *Id.* As of February 4, 2019, IAS had nine lieutenants, but Plaintiff was never notified of when to report to his new assignment in the SOS even after his replacement, Lt. Ryan, arrived.  *Id.*

Plaintiff involved the FOP at some point during February 2019, notified Chief Cali and Major Lansey "of the violation of the FOP contract," and initiated an internal complaint against Major Lansey.  Shortly thereafter, Major Lansey summoned Plaintiff into her office and informed Plaintiff that he was no longer permitted to continue his secondary employment with CI-Technologies.  *Id.*  Plaintiff had enjoyed this secondary employment since 2015, and the loss of this secondary employment caused Plaintiff a purported loss of $11,250 in income.  *Id.*

Plaintiff's transfer to the SOS was finally effectuated some time in February 2019 when Plaintiff went on to work in the SOS for eleven months.  *Id.* at p. 9.  Although Plaintiff still has not provided an indication as to specifically when this transfer occurred, Major Lansey supposedly informed other officers shortly thereafter that she had "forced him out" of IAS.  *Id.* at p. 8. Following Plaintiff's eleven-month stint with the SOS, he applied for a newly vacant lieutenant position in IAS and sought to return to IAS.  *Id.* at 9.  Plaintiff inquired about the position with the new Deputy Commissioner, Brian Nadeau ("DC Nadeau"), because Major Lansey was still assigned to IAS, but DC Nadeau assured Plaintiff that "things would be different under his

command." *Id.*  Plaintiff's application was accepted and he returned to work in IAS in or around January 2020. *Id.*[6]

Plaintiff's new supervisor at IAS was Capt. Donald Diehl.  *Id.*  Prior to Plaintiff reporting back to IAS, DC Nadeau directed Capt. Diehl to speak with Plaintiff regarding how things would be different upon Plaintiff's return to IAS.  *Id.*  Capt. Diehl informed Plaintiff that DC Nadeau instructed Major Lansey not to have any direct contact with Plaintiff.  *Id.*  Plaintiff alleges that this instruction "caused [him] reputational harm and emotional distress in addition to the negative impact to his work as Plaintiff then had to work around this structural gap in his chain of command."  *Id.*  Plaintiff also posits that his internal BPD complaint remains "open" to this day because "no other Officers want to be linked to the matter by logging it as closed."  *Id.* at p. 10. Specifically, Detective Sergeant Freda Arrington informed Plaintiff that the original case file for his complaint indicated that it was "sustained" and that the decision had not yet been signed off by Defendant's human resource and legal representatives, yet Plaintiff received a letter incorrectly stating that the charges lodged in his internal complaint were unsustained.[7]  According to Plaintiff, Defendant's incorrect designation of Plaintiff's internal complaint as unsustained and Defendant's failure to take any disciplinary or remedial actions regarding Major Lansey has resulted in Plaintiff experiencing "a hostile work environment in which he is being treated as an outsider as part of the 'go-along-to-get-along' culture that is pervasive throughout BPD . . . ."  *Id.*

---

[6] At the time of Plaintiff's return to IAS, IAS had been renamed as the Public Integrity Bureau ("PIB").  *Id.* at p. 9, n.1.  For purposes of clarity—and because the vast majority of Plaintiff's allegations relate to the period before IAS's renaming—the Court will refer to PIB as IAS throughout this Memorandum Opinion, just as it did in the prior.

[7] Plaintiff provides no indication as to when or under what circumstances this communication with Detective Sergeant Arrington occurred.

With the foregoing facts in mind, Plaintiff contends that he "has since been the target of race and color discrimination, retaliation, and workplace hostility." *Id.* at p. 12. Plaintiff filed a formal Charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on December 7, 2021, alleging race and color discrimination, retaliation, and hostile work environment. *Id.* at p. 3; (ECF No. 10-4 at p. 2). This was "in addition to his internal complaint . . . ." *Id.* Plaintiff also alleges that that he was forced to inquire into the results of the investigation which followed from his internal complaint, and that only upon his inquiry was Plaintiff sent a letter regarding the outcome of his internal complaint's investigation. *Id.* Defendant again moves to dismiss Plaintiff's Amended Complaint on three grounds: (1) Plaintiff's Title VII hostile work environment claims are time-barred; (2) Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted under Title VII, 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. §§ 1981, 1983; and (3) Defendant is immune from suit on Plaintiff's MFEPA claim.

## II.    STANDARD OF REVIEW

State sovereign immunity provides that "a state may not be sued by a private citizen absent its consent . . . ." *Dennard v. Towson Univ.*, 62 F. Supp. 3d 446, 450 (D. Md. 2014); *see Effland v. Balt. Police Dep't*, No. 1:20-cv-3503-CCB, 2022 WL 3107144, at *6 (D. Md. Aug. 4, 2022) ("Under the doctrine of sovereign immunity, neither a contract nor a tort action may be maintained against the State unless specific legislative consent has been given and funds (or the means to raise them) are available to satisfy the judgment."). Although state sovereign immunity originates in the Eleventh Amendment to the U.S. Constitution, "common law sovereign immunity 'predated' adoption of the Eleventh Amendment, which 'confirmed, rather than established, sovereign immunity as a constitutional principle.'" *Dennard*, 62 F. Supp. 3d at 450 (quoting *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005)). When a defendant raises the defense of Eleventh

Amendment sovereign immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell*, 2018 WL 6523883 at *3; *see Criscione v. U.S. Nuclear Regul. Comm'n*, 493 F. Supp. 3d 423, 430 (D. Md. 2020).  Defects in subject matter jurisdiction cannot be waived or consented to. *Roche v. Lincoln Prop. Co.*, 373 F.3d 610, 621 (4th Cir. 2004), *rev'd on other grounds*, 546 U.S. 81 (2005); *State v. Ivory*, 906 F.2d 999, 1001 n.2 (4th Cir. 1990).

The Court detailed previously in its June 6, 2023, Memorandum Opinion how the Fourth Circuit has "noted important differences between a traditional subject matter jurisdiction analysis under Article III to the Constitution as compared to the hybrid jurisdictional analysis required by the Eleventh Amendment." *Forrest*, 2023 WL 3847429 at *4.  For instance, unlike traditional subject matter jurisdiction, Eleventh Amendment sovereign immunity may be waived by the parties and imposes no requirement on a court to raise the issue *sua sponte*. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005).  Nevertheless, the weight of authority in this District indicates that Eleventh Amendment sovereign immunity challenges are best resolved under Rule 12(b)(1) rather than Rule 12(b)(6), so the Court continues to do so here. *See, e.g.*, *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018) (collecting cases); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 579 n.6 (D. Md. 2021).

Regarding Defendant's arguments that Plaintiff fails to state a claim upon which relief can be granted, the Court adjudicates such arguments under Rule 12(b)(6).  "Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *4 (D. Md. Mar. 15, 2016).  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint

and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court of the United States' opinions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 544 (2007), "require that complaints in civil actions be alleged with greater specificity than previously required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 288 (4th Cir. 2012)). When ruling on a Rule 12(b)(6) motion to dismiss, a court must apply "[t]wo working principles . . . ." *Iqbal*, 556 U.S. at 678. First, although a court must accept as true all the factual allegations contained in a complaint, any legal conclusions that are drawn from those facts are not afforded such deference. *See id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[]" to plead a claim). Second, a complaint shall be dismissed if it does not allege a "plausible claim for relief . . . ." *Id.* at 679. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citation omitted). In determining whether a plaintiff has stated a plausible claim for relief, a court must "draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).[8]

---

[8] "[U]nder limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment." *Yampierre v. Balt. Police Dep't*, No. ELH-21-1209, 2022 WL 3577268, at *17 (D. Md. Aug. 18, 2022) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). As such, "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Yampierre*, 2022 WL 3577268 at *17 (citing *Campbell v. Mayorkas*, No. 3:20-cv-697-MOC-DSC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021)).

### III.   ANALYSIS

#### A.  Plaintiff's Claims Brought Under Title VII (Counts I, II, and III) Are Still Time-Barred.

"To assert a Title VII claim in federal court, a plaintiff must first exhaust his administrative remedies." *Montgomery v. Crothall Healthcare, Inc.*, No. RDB-2—1154, 2021 WL 75136, at *3 (D. Md. Jan. 8, 2021).  To properly exhaust administrative remedies "In Maryland, a deferral state, a claim of discrimination under Title VII . . . must be filed with the EEOC within 300 days of the alleged discriminatory action." *Trazell v. Del. Elevator, Inc.*, No. CV RDB-20-2265, 2020 WL 5982888, at *1 (D. Md. Oct. 8, 2020), *aff'd*, 837 F. App'x 248 (4th Cir. 2021).  Plaintiff filed his EEOC charge on December 7, 2021, and thus the Court can consider only those instances of alleged discrimination that occurred on or after February 10, 2021, as timely raised.  The Court previously synthesized Plaintiff's Title VII claims in Counts I–III as follows: Count I (race discrimination) is "predicated on alleged discrete acts of discrimination separate and apart from any alleged theory of a hostile work environment," meaning that Plaintiff was required to plead sufficient facts to demonstrate that such discriminatory actions were taken against Plaintiff on account of his race on or after February 10, 2021; Count II (hostile work environment) is based on an assertion that discrimination against Plaintiff was ongoing and, thus, "at least one act contributing to an alleged hostile work environment [must have] occurred within the limitations period"; and Count III (retaliation) is a "hybrid" claim under Title VII because "retaliation can be based either on discrete acts or on the creation of a hostile work environment as retaliation for engaging in protected activity." *Forrest*, 2023 WL 3847429 at * 7.

Accordingly, the Court determined that, in order for Plaintiff's Title VII claims to proceed, Plaintiff needed to allege in Count I and potentially Count III, if Plaintiff was pursuing Count III based on discrete acts of discrimination, that such discrete acts of discrimination occurred on or

after February 10, 2021.  Plaintiff failed to do so, and Counts I and III—to the extent that Count III was predicated on discrete acts rather than on a hostile work environment—were dismissed *with* prejudice.  *Id.* at *9.  Moreover, the Court dismissed *without* prejudice Plaintiff's Title VII claims grounded in hostile work environment allegations, i.e. Count II and the remainder of Count III, because Plaintiff failed to plead any facts indicating that at least one act contributing to the alleged hostile work environment occurred on or after February 10, 2021.  *Id.* at *8–9.  In dismissing Counts I and III without prejudice, the Court made clear that Plaintiff's hostile work environment claims could be saved "only if a discriminatory adverse action is alleged to have occurred within the 300-day pre-filing period."  *Id.* at *8.

Plaintiff's Amended Complaint does not cure these deficiencies.  Revisiting Plaintiff's allegations in chronological order: Plaintiff's supervisory diminution and access restriction from level 1 to level 2 occurred around November 2018; Defendant's re-routing of informational requests to Plaintiff and Plaintiff's IApro and BlueTeam access restrictions occurred in December 2018; Chief Cali's refusal to allow Plaintiff to transfer to the SOS before finding a replacement[9] and Plaintiff's access restrictions from level 2 to level 3 occurred in January 2019; and Major Lansey's directive that Plaintiff forfeit his secondary employment and subsequent statements about forcing Plaintiff out of IAS occurred in or around February 2019.  Those were the only dates provided by Plaintiff in his original Complaint regarding discrete acts of alleged discrimination being committed against him, and they are yet again the same dates provided by Plaintiff in his

---

[9] To the extent that Plaintiff argues Defendant's refusal to effectuate his transfer to the SOS was discriminatory, Plaintiff adds in his Amended Complaint that Plaintiff's transfer request *back to IAS* occurred in or around January 2020.  Thus, any alleged discriminatory refusals by Defendant to transfer Plaintiff to the SOS without first obtaining a replacement must have necessarily occurred prior to January 2020, more than a year before the operative Title VII limitations period.

Amended Complaint.  *Compare* (ECF No. 1), *with* (ECF No. 17).  Most of the additions to

Plaintiff's Amended Complaint were tacked on in the following three paragraphs:

> Despite having brought Major Lansey's treatment to the attention of Defendant by his internal complaints to the FOP and his command, Plaintiff was not provided with sufficient response to remove him from the hostile work environment he was experiencing or to prevent him from suffering additional harm to his professional advancement due to the hinderance of his duties in creating 'workarounds' in his chain of command, all while other members of his unit were fully aware of his status as an Officer who had made complaints against his command.  Plaintiff continued to suffer from the hostile work environment created by Major Lansey and the Department's failure to properly address her actions until her transfer from the unit on May 16, 2021.

> Due to Defendant's inaction on his complaint, he suffered reputational harm within BPD which continues to this day—upon information and belief, Plaintiff's internal BPD EEO case remains designated as 'open' in Defendant's database because no other Officers want to be linked to the matter by logging it as closed.  Detective Sergeant Freda Arrington informed Plaintiff that the original case file for his complaint indicated that it was 'sustained' and that the decision had been signed off on by Defendant's HR and Legal representatives, yet he received an erroneous letter indicating that his charge was unsustained.  Sgt. Arrington further indicated to Plaintiff that she has copies of the original concurrence findings issued in his complaint, which may be produced during discovery.

> Because Defendant incorrectly designated Plaintiff's complaint as unsustained and has failed to take any disciplinary or remedial actions regarding Major Lansey, Plaintiff still is experiencing a hostile work environment in which he is being treated as an outsider as part of the 'go-along-to-get-along' culture that is pervasive throughout BPD, where it is known but not written that you do not speak out against your 'brothers or sisters in Blue' because you will be subjected to the retaliatory 'Blue Code of Silence'—which is an expression that refers to the law enforcement community to 'stick together' or be ostracized within it.  Plaintiff complained against his command by way of filing external and internal complaints and these complaints were brushed aside in violation of BPD's Anti-Retaliation Policy 1729 that states, 'Failure of a commander or supervisor to take corrective action on a Complaint of Retaliation, as described below, shall be reported to the Commander of the Public Integrity Bureau for further investigation and may subject the commander or supervisor to disciplinary action, up to and including termination.'

BPD was aware of this illegal custom and/or practice and did nothing to stop it resulting in a violation of Plaintiff's constitutional rights.[10]

(ECF No. 17 at pp. 9–11).  The above additions are vague, largely conclusory, and do not allege sufficiently specific "discriminatory adverse actions [that] occurred within the 300-day pre-filing period." *Forrest*, 2023 WL 3847429 at *8.[11]  Plaintiff's reliance on Defendant's lack of initiative in investigating and timely resolving Plaintiff's internal complaint is misplaced because this Court has incessantly held that the failure to investigate an internal complaint does not constitute an adverse action for Title VII purposes.  *See, e.g.*, *Jones v. Balt. City Bd. of Sch. Comm'rs*, No. CV ADC-18-3002, 2021 WL 147033, at *8 (D. Md. Jan. 14, 2021); *Mason v. Montgomery Cnty. Police Dep't*, No. 8:13-CV-01077-AW, 2013 WL 6585928, at *5 (D. Md. Dec. 13, 2013); *Broadway v. Univ. of Maryland, Glob. Campus*, No. CV GLS 21-3226, 2023 WL 4421406, at *8 (D. Md. July 7, 2023); *Danial v. Morgan State Univ.*, Civ. No. CCB 17-959, 2018 WL 3625767, at *5 (D. Md. July 27, 2018); *Yampierre*, 2022 WL 3577268 at *37.  Accordingly, Plaintiff has failed to sufficiently amend his complaint as to make clear (or at least raise an inference) that his Title VII claims are not time-barred, despite the Court's unambiguous directive on how to do so, and the Court shall dismiss Plaintiff's Title VII claims—Counts I, II, and III—in their entirety.

---

[10] The Court notes that several of these additions to Plaintiff's Amended Complaint are copied and pasted from Plaintiff's Opposition to Defendant's first Motion to Dismiss. *Compare, e.g.*, (ECF No. 17 at pp. 9–11), *with* (ECF No. 11-1 at p. 8).  Interestingly, Plaintiff even copied and pasted the same preface to his Amended Complaint that the Court previously found insufficient to support Plaintiff's claims and subsequently informed Plaintiff that it was the verbatim or nearly identical language already struck down by this Court in at least two other instances recently. *See Forrest*, 2023 WL 3847429 at *11 n.20.

[11] Plaintiff's response in Opposition to the Motion on this issue is no less vague, but just as conclusory.  *See, e.g.*, (ECF No. 21-1 at p. 3) (arguing that Plaintiff was "subjected to a slowly escalating series of injuries that resulted in financial harm, reputational harm, harm to Plaintiff's career advancement, and emotional distress due to the disparate treatment and hostile work environment he experienced"); *id.* ("Plaintiff continued to suffer ongoing harassment and a hostile work environment at the hands of Defendant."); *id.* ("Defendant's representatives instead created a work environment that isolated and singled out Plaintiff as 'an Officer who had made complaints against his command . . . .'")

**B.  Even if Plaintiff's Title VII Hostile Work Environment Claims Were Not Time-Barred, Plaintiff Fails to State a Claim for Relief.**

Defendant also argues that, "even assuming Plaintiff could somehow revive his untimely Title VII hostile work environment claims the Amended Complaint fails to state a claim for a hostile work environment in violation of Title VII."  (ECF No. 20-2 at p. 8).  Defendant is correct. Title VII prohibits, among other things, racial harassment that creates a hostile work environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  "To make such a claim, [the plaintiff] must show she was subjected to (1) unwelcome conduct, (2) based on her race . . . that was (3) severe or pervasive enough to make [the plaintiff's] work environment hostile or abusive and (4) imputable to [plaintiff's] employer."  *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020). Although the Court has doubts as to whether Plaintiff can satisfy the third element, the Court finds that Plaintiff certainly cannot satisfy the second.

"To satisfy the second element of a hostile work environment claim, the plaintiff must allege that she was harassed or otherwise discriminated against '*because of*' her protected class." *Gaines v. Balt. Police Dep't*, No. CV ELH-21-1211, 2022 WL 1451629, at *19 (D. Md. May 9, 2022) (emphasis added).  This requires a showing that, "but for" Plaintiff's membership in a protected class, he would not have suffered discrimination.  *Id.*  Plaintiff relies heavily on the fact that Defendant allowed several White individuals to transfer out of their divisions without prior human resources approval or before finding a replacement in arguing that Plaintiff was discriminated against because of his race.  *See* (ECF No. 21-1 at p. 6); *Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir. 1998) (acknowledging that "race or age based animosity could be shown by [defendant's] differential treatment of similarly situated" employees).  Namely, Lt. Morris, Lt. Ryan, and Lt. Shroyer all transferred divisions without finding a replacement beforehand or without an "HR order."  (ECF No. 21-1 at p. 6; ECF No. 17 at p. 11).

14

As noted in the Court's June 6, 2023, Memorandum Opinion, Plaintiff largely failed to provide in his original Complaint details regarding from which divisions these purported comparators were transferred or which divisions these purported comparators were transferred to. *Forrest*, 2023 WL 3847429 at *3. Plaintiff's Amended Complaint sheds no further light. The only exceptions are Lt. Morris, who was transferred to Criminal Intel from Ethics in May 2018, and Lts. Ryan and Shroyer who transferred *into* IAS without any indication as to where they transferred from. (ECF No. 17 at p. 11–12). But more notable here, Plaintiff also set forth facts indicating that other African American employees were transferred to other divisions without replacements, thereby undercutting Plaintiff's own argument that his differential treatment was but for his race. *See* (ECF No. 17 at p. 11) (noting the transfer of Sgt. Scott (Black female), CSO Cunningham (Black female), and OSS IIII Crockett (Black female) without replacements). Combined with the fact that the individual primarily accused of discriminating against Plaintiff— Major Lansey—is also African American, there is little to no indication that Plaintiff's treatment was motived by racial animus. *See James v. Verizon*, 792 F. Supp. 2d 861, 869–70 (D. Md. 2011) ("[P]roof that the decision-maker is a member of the same protected class as [plaintiff] weakens any possible inference of discrimination.") (citing *Jackson v. Sch. Bd. of the City of Richmond*, No. 3:99cv642, 2000 WL 34292578 (E.D. Va. Mar. 15, 2000)); *cf. Coggins v. Gov't of D.C.*, 173 F.3d 424, at *4 (4th Cir. 1999) (finding that racial bias in Title VII claim was "unlikely" where alleged discriminators were of the same protected class as plaintiff); *Testa v. CareFusion*, 305 F. Supp. 3d 423, 437 (E.D.N.Y. 2018) (finding ADEA discrimination claim unsupported in part because alleged discriminators "were also members of the protected class"); *Dortch v. Cellco P'ship*, No. CV 3:17-145-DCC-PJG, 2018 WL 4560537, at *5 (D.S.C. Apr. 4, 2018), *report and recommendation adopted*, No. CV 3:17-145-DCC, 2018 WL 4103335 (D.S.C. Aug. 29, 2018),

*aff'd*, 770 F. App'x 643 (4th Cir. 2019) (finding that evidence of "discriminatory animus based on race" was undercut by the fact that the alleged discriminators were of the same protected class). Accordingly, even if Plaintiff's Title VII hostile work environment claims are not time-barred, which they are, they nevertheless fail to state a claim upon which relief may be granted because Plaintiff has alleged insufficient facts indicating that any alleged discriminatory actions taken against him were motived by Plaintiff's race. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (affirming Rule 12(b)(6) dismissal of hostile work environment claim because plaintiff's factual allegations "merely t[old] a story of a workplace dispute regarding her reassignment and some perhaps callous behavior by her superiors"); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 321 (finding that plaintiff's hostile work environment claim was insufficient where plaintiff failed to establish that her treatment was "because of" her protected class "rather than the result of non-[protected class]-related personal friction between her and [her supervisor]").[12]

### C.  Plaintiff Still Has Not Sufficiently Pleaded His § 1983 *Monell* Claim (Count IV).

Plaintiff re-alleges in Count IV that "Defendant, and its responsible management officials . . . unlawfully deprived Plaintiff of his civil rights in violation of Sections 1981 and 1983 of the Civil Rights Act and the First Amendment when it retaliated against Plaintiff for having engaged in protected activity by complaining of discrimination on the basis of race . . . ."  (ECF No. 17 at pp. 19–20).

---

[12] Because the Court finds dismissal of Plaintiff's Title VII claims proper since they are time-barred, or in the alternative that they fail to state a plausible claim for relief, the Court declines to address Defendant's argument that Plaintiff's Title VII claims are subject to dismissal for exceeding the scope of Plaintiff's EEOC Charge.  (ECF No. 20-2 at pp. 7–8).

The Court previously acknowledged that to state a claim under § 1983, "a plaintiff must allege: '(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.'" *Forrest*, 2023 WL 3847429 at *10 (quoting *Gaines v. Balt. Police Dep't*, No. ELH-21-1211, 2023 WL 2185779, at *23 (D. Md. Feb. 22, 2023)); *Gaines*, 2023 WL 2185779 at *23 ("However, § 1983 is not itself a source of substantive rights, but provides a method for vindicating federal rights elsewhere conferred.").[13]  When the alleged rights infringement arises from a claim of retaliation, the Court analyzes whether a plaintiff can establish a prima facie retaliation claim under 42 U.S.C. § 1981, which features the same requirements as a retaliation claim brought under Title VII: (1) that the plaintiff engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal link between the participation in protected activity and the adverse employment action.  *See Gaines*, 2023 WL 2185779 at *23; *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 272–73 (4th Cir. 2015); *Forrest*, 2023 WL 3847428 at *9–11 (summarizing the basis on which a plaintiff may successfully assert a § 1983 claim for retaliation).  Plaintiff has re-alleged two protected acts for which Defendant allegedly retaliated: (1) Plaintiff's internal complaint with Defendant; and (2) Plaintiff's formal EEOC charge.  (ECF No. 17 at p. 17).

Moreover, "It is well established that in a § 1983 case a city or other local government entity cannot be subject to liability at all unless the harm was caused in the implementation of

---

[13] The Court issued its decision in *Gaines* on February 22, 2023. However, on April 7, 2023, the author of *Gaines*—the Honorable Ellen L. Hollander—wrote to the parties in *Gaines* to inform them that the opinion had been selected for publication in the Federal Supplement. (Dkt. No. 1:21-cv-01211-ELH at ECF No. 24). Judge Hollander's correspondence to the parties in *Gaines* indicated that she "made a handful of non-substantive, 'bluebook' corrections." *Id.* at p. 1. Accordingly, the opinion in *Gaines* was reissued on April 7, 2023. Dkt. No. 1:21-cv-01211-ELH at ECF No. 25.  Although the *Gaines* opinion appears twice published on Westlaw, the Court cites only to the original February 22, 2023 edition.

official municipal policy." *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1951 (2018).

As the Court previously described:

> A plaintiff may show the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that manifest deliberate indifference to the rights of citizens. Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute 'a custom or usage' with the force of law. Furthermore, such a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees . . . or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state.

*Forrest*, 2023 WL 3847429 at *11 (citations omitted). "[A] § 1983 plaintiff must identify a specific policy or custom of the local government that caused his injury. Isolated incidents of unconstitutional activity are insufficient to establish liability" under § 1983. *Blake v. Balt. County, Md.*, 662 F. Supp. 417, 423 (D. Md. 2009).

The Court previously determined there was no causal connection between Plaintiff's internal complaint and any retaliatory conduct because Plaintiff provided no indication as to when he filed his internal complaint. *Forrest*, 2023 WL 3847429 at *10. The Court also found that Plaintiff's original Complaint was "devoid of any specific allegations regarding adverse actions occurring after Plaintiff filed his formal EEOC charge" and therefore determined Plaintiff had not stated a claim for retaliation under § 1981. *Id.* To address the first conclusion, Plaintiff's Amended Complaint now asserts that Plaintiff filed his internal complaint against Major Lansey "in February 2019." (ECF No. 17 at p. 8). To address the second, Plaintiff's Amended Complaint also includes allegations that the Defendant retaliatorily misidentified the findings of Plaintiff's internal

complaint and failed to timely log Plaintiff's internal complaint as "closed."  (ECF No. 17 at pp. 20–21; ECF No. 21-1 at pp. 7–8).

The Court finds these additions insufficient to permit Plaintiff's Count IV to proceed.  The Court has already recounted that the improper handling of an internal complaint is not an "adverse employment action." *Gaines*, 2023 WL 2185779 at *23.  But even if the unidentified individual(s) did indeed mishandle Plaintiff's internal complaint—at a time not specified by Plaintiff in his Amended Complaint—and such mishandling constituted an adverse employment action sufficient to find that Defendant violated Plaintiff's rights against unlawful retaliation, the Court cannot identify how these facts constitute actions sufficient to establish a *Monell* claim.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  "A single plaintiff pleading alleged mistreatment and conclusively asserting that such treatment is an example of a wider practice is not sufficient to turn a Title VII claim into a § 1983 claim.  To adequately plead a *Monell* claim, a complaint mut include more facts that could enable the Court to infer that the allegedly impermissible policy affected more than just the plaintiff." *Jacques v. Balt. City Police Dep't*, No. CV 21-2682-BAH, 2023 WL 3198122, at *11 (D. Md. May 2, 2023).

Here, the bulk of Plaintiff's proffered discriminatory treatment occurred before Plaintiff's internal and formal EEOC complaints.  The retaliatory discrimination that Plaintiff claims occurred after the filing of those complaints, i.e. misidentifying Plaintiff's internal complaint and allowing it to remain "open," appears to be nothing more than an isolated incident, even assuming *arguendo* that the mishandling of Plaintiff's internal complaint constituted an actionable deprivation of his

rights.  *See Blake*, 662 F. Supp. 2d at 423–24 (finding that defendant Baltimore County could not be held responsible under § 1983 where the alleged constitutional deprivation of rights "was an isolated incident not tied to any Baltimore County directive"); *Corbitt v. Balt. Police Dep't*, No. RDB-20-3431, 2021 WL 3510579, at *7 (D. Md. Aug. 10, 2021) ("[A] single incident alone will not establish a policy or custom and requisite causal connection to [a §] 1983 deprivation of rights.").  Plaintiff's Amended Complaint still contains no specific allegations regarding who undertook these actions or when exactly (or even roughly) they occurred, nor has Plaintiff proffered that "the allegedly impermissible policy affected more than just the plaintiff." *Jacques*, 2023 WL 3198122 at *11.  Plaintiff merely asserts that the mishandling of his internal complaint evidences "failures" that are "so extensive as to constitute either a conscious disregard and deliberate indifferent to BPD policy and law, or a widespread failure of training . . . ."  (ECF No. 17 at pp. 20–21).[14]  Yet Plaintiff does not supplement that assertion with facts inferring that this treatment was widespread or an impermissible policy/custom of the Defendant to which the Plaintiff fell victim.  *See Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984) ("[A] municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees."); *Brent v. City of Cumberland Police Dep't*, No. CV JKB-22-1349, 2023 WL 2457591, at *10 (D. Md. Mar. 10, 2023) (concluding that dismissal of *Monell* claim was warranted where plaintiff "failed to allege other incidents giving rise to a persistent and widespread practice") (quotation omitted).  Rather, the Amended Complaint copies and pastes assertions already deemed by the

---

[14] This Court previously described the manner in which a municipality may be held liable under § 1983 for failure to train its employees properly. *See Forrest*, 2023 WL 3847429 at *12.  The Court dismissed any such argument by Plaintiff because "Plaintiff's Complaint [was] woefully deficient regarding the nature of the training, whether the training was a deliberate or conscious choice by Defendant, or whether the alleged adverse conduct resulted from said training." *Id.* Plaintiff chose not to include additional factual assertions addressing these issues in his Amended Complaint and the Court therefore sees no reason to conclude differently now.

Court as insufficient to establish even an inference of *Monell* liability followed by general, conclusory statements that fare no better. *See Forrest*, 2023 WL 3847429 at *12; (ECF No. 17 at pp. 20–21). As such, Plaintiff's *Monell* claim must be dismissed.

### D. Defendant's Eleventh Amendment Sovereign Immunity Still Shields It from Liability Under the MFEPA (Count V).

Lastly, the Court previously determined that Plaintiff's MFEPA claim in Count V could not proceed because "Defendant enjoys Eleventh Amendment sovereign immunity as to that claim." *Forrest*, 2023 WL 3847429 at *13. Plaintiff's Amended Complaint attempts to resurrect his MFEPA claim by including a citation to Md. Code Ann. S.G. § 20-903, which reads: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title." At first glance this may seem to indicate that Defendant has waived its sovereign immunity over Plaintiff's MFEPA claim. But the Court already referenced this statutory provision in its prior Memorandum Opinion to explain that, based on additional statutory provisions of the Maryland Code and a dearth of authority in this District, the doctrine of sovereign immunity nevertheless shields Defendant from Plaintiff's MFEPA *state law* claim even if Defendant has waived its sovereign immunity defense in other *federal law* contexts. *See* Md. Code Ann. S.G. § 20-1013(b) ("A civil action under this section *shall* be filed *in the circuit court for the county* where the alleged unlawful employment practice occurred.") (emphasis added); *Effland*, 2022 WL 3107144 at *6–7; *Bumgardner v. Taylor*, No. RDB-18-1438, 2019 WL 1411059, at *6 (D. Md. Mar. 28, 2019); *Fish v. Mayor of Balt.*, No. CCB-171438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Open Just. Balt. v. Balt. City L. Dep't*, No. CV ELH-22-1901, 2023 WL 5153654, at *20 (D. Md. Aug. 10, 2023) (collecting cases where the Court has found that BPD is not protected by sovereign immunity "*for the purposes of § 1983*") (emphasis added). Accordingly, Plaintiff's cloned argument must be rejected in similar fashion, and the

Court shall dismiss Count V with prejudice.  *See Garcia v. Balt. Police Dep't*, No. CV BPG-22-1423, 2023 WL 3043953, at *7 n.2 (D. Md. Apr. 21, 2023) ("[D]efendant [BPD] is entitled to sovereign immunity and cannot be liable for the violated alleged by plaintiff under the MFEPA. No amendment of the complaint, therefore, would cure that defect.").

### IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 20) is **GRANTED**. Plaintiff's Amended Complaint is dismissed with prejudice and without leave to amend.  A separate Order follows.


Date: September 29, 2023                                    _____/s/_____
                                                           J. Mark Coulson
                                                           United States Magistrate Judge